IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| **LEAH BETH LEEDY,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:11CV00005 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: James P. Jones |
| **COMMISSIONER OF** ) | United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

*Lewey K. Lee, Lee & Phipps, PC, Wise, Virginia, for Plaintiff. Eric P. Kressman, Regional Chief Counsel, Region III, Maija DiDomenico, Assistant Regional Counsel, Robert W. Kosman, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Leah Beth Leedy filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits pursuant to Titles II and XVI of the Social Security Act ("Act"), 42

U.S.C.A. §§ 401-433, 1381-1383d (West 2003 & Supp. 2011).  Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Leedy filed for benefits on July 26, 2007, alleging that she became disabled on July 18, 2007.  Her claim was denied initially and upon reconsideration.  Leedy received a hearing before an administrative law judge ("ALJ"), during which Leedy, represented by counsel, and a vocational expert testified.  The ALJ denied Leedy's claim, and the Social Security Administration Appeals Council denied her Request for Reconsideration.  Leedy then filed her Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed.  The case is ripe for decision.

II

Leedy was born on February 16, 1985, making her a younger person under the regulations.  20 C.F.R. § 404.1563(c) (2011).  Leedy has a high school education[1] and has worked in the past as a cashier, grocery clerk, food preparation worker, and customer service representative.  She originally claimed she was

---

[1] At the time of the administrative hearing, Leedy was enrolled in her second semester of a respiratory therapy program at Mountain Empire Community College.

disabled due to epilepsy, severe anxiety, back and knee problems, high blood pressure, and sleeping problems.

In November 2005, Leedy sought treatment at Mountain Empire Neurological Associates for complaints of seizures. Shawn K. Nelson, M.D., noted that an EEG and MRI of the brain were negative. Dr. Nelson prescribed Topamax.

In January 2006, Leedy returned to Mountain Empire Neurological Associates for a follow-up visit. She reported that she had not had any seizures since taking Topamax. Leedy also complained of anxiety and was prescribed Paxil.

Leedy visited the emergency room nine times for various complaints between January 2007 and January 2008. In January 2007, Leedy requested examination for a possible seizure. She reported a history of seizures, but denied taking her medication. A brain MRI was normal, and Leedy was encouraged to consult with her primary care physician if her symptoms returned.

The following month, Leedy returned to the emergency room with complaints of knee pain associated with Osgood-Schlatter disease. A physical examination revealed normal findings. Leedy was prescribed pain medication and ace bandages.

Leedy reported to the emergency room with complaints of an anxiety attack in April 2007. The emergency room physician noted that she smelled of alcohol. Leedy was told to consult her primary care doctor for anxiety medication.

In June 2007, Leedy sought emergency care for complaints of back pain after falling off a ladder. X rays of the sacrum, coccyx, thoracic spine, and lumbar spine were normal. Leedy was diagnosed with a lumbar muscle spasm and prescribed pain medication and a muscle relaxant.

The following month, Leedy complained of left knee pain. She reported no known injury and stated it "just act[ed] up ever so often." (R. at 267.) Michael Sanders, M.D., noted that Leedy had normal range of motion, normal gait, and no vascular compromise in her left knee. Dr. Sanders administered a steroid injection and prescribed pain reliever and anti-inflammatory medication.

At the referral of Dr. Sanders, Leedy consulted with Daryl Larke, M.D., of Community Orthopedics, in July 2007. She complained of sporadic left knee pain for six or seven years, but was unable to identify any specific injury. Dr. Larke observed no bruising, swelling, discoloration, or other abnormalities. He noted normal range of motion in both knees. Dr. Larke opined that Leedy's knee pain complaints were "out of proportion to what c[ould] be seen clinically." (R. at 278.)

In November 2007, Frank Johnson, M.D., a state agency physician, reviewed Leedy's medical records to assess her physical residual functional

capacity. He opined that Leedy had no significant physical limitations and was capable of performing a range of work. Joseph Duckwall, M.D., independently reviewed Leedy's medical records in February 2008 and agreed with Dr. Johnson's conclusions.

Julie Jennings, Ph.D., a state agency psychologist, also reviewed Leedy's medical records in November 2007. Dr. Jennings reported that Leedy's anxiety caused mild restrictions in her daily activities, but that her mental impairment was not severe. In February 2008, Louis Perrott, Ph.D., another state agency psychologist, independently reviewed Leedy's medical records and also concluded that her anxiety was not a severe impairment.

In December 2007, Leedy reported to the emergency room with complaints of back pain associated with her fall off the ladder from five months earlier. With the exception of decreased range of motion in her back, the emergency room physician reported normal physical findings and diagnosed acute lumbar myofascial strain.

In April 2008, B. Wayne Lanthorn, Ph.D., completed a psychological evaluation of Leedy at the request of her attorney. Leedy stated that she currently was enrolled in community college and that her grades were "pretty good." (R. at 419.) She reported smoking one and a half packs of cigarettes daily and admitted a history of illicit drug use. Upon examination, Dr. Lanthorn noted that Leedy was

pleasant, oriented, fully cooperative, and displayed no signs of ongoing psychotic processes or delusional thinking. However, Dr. Lanthorn stated that Leedy had marked difficulties with anxiety and other areas of emotional conflict. He diagnosed her with generalized anxiety disorder, major depressive disorder, social phobia, panic disorder, and personality disorder. Dr. Lanthorn assessed a GAF score of 55-60.[2]

Leedy attended monthly medication management visits with a psychiatrist, Uzma Ehtesham, M.D., from January 2008 through July 2009. Dr. Ehtesham consistently reported that Leedy avoided eye contact and had an anxious affect, but that she had no attention problems, no hallucinations or delusions, no suicidal ideations, normal thought content, intact judgment, and improved reality testing. Dr. Ehtesham assessed a GAF score of 60. She diagnosed Leedy with panic disorder, generalized anxiety disorder, and bipolar disorder. However, at numerous visits, Dr. Ehtesham reported that Leedy's depression was improving or stable with Klonopin.

In April 2009, Dr. Ehtesham noted that Leedy was able to maintain a job. (R. at 460.) Yet, in June 2008 and July 2009, Dr. Ehtesham completed mental

---

[2] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in social, occupational, or school functioning. See Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

residual functional capacity assessments stating that Leedy was "permanently disabled" and unable to work. (R. at 432.)

At the administrative hearing held in September 2009, Leedy testified on her own behalf. Leedy confirmed that she was able to complete many daily activities such as attend college classes, do homework, clean her room, do laundry, care for her personal needs, prepare simple meals, drive, and shop in stores. John Newman, a vocational expert, also testified. He classified Leedy's past work as a cashier as light, unskilled; her past work as a grocery clerk as medium, unskilled; her past work as a food preparation worker as light, unskilled; and her past work as a customer services representative as sedentary, semi-skilled.

After reviewing all of Leedy's records and taking into consideration the testimony at the hearing, the ALJ determined that she had severe impairments of arthropathies, anxiety disorder, and history of seizures, but that none of these conditions, either alone or in combination, met or medically equaled a listed impairment.

Taking into account Leedy's limitations, the ALJ determined that Leedy retained the residual functional capacity to perform a range of medium exertional work that involved lifting and/or carrying 50 pounds occasionally and 25 pounds frequently, and sitting or standing for six hours out of an eight-hour workday. However, the ALJ stated that Leedy could not work at unprotected heights, climb

ladders, ropes, or scaffolds, or work around hazardous machinery or vibrating surfaces. She was limited to jobs with only occasional interactions with the general public. The vocational expert testified that someone with Leedy's residual functional capacity could work as a laundry worker, a packer, or an assembler. The vocational expert testified that those positions existed in significant numbers in the national economy. Relying on this testimony, the ALJ concluded that Leedy was able to perform work that existed in significant numbers in the national economy and was therefore not disabled under the Act.

Leedy argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly determined Leedy's residual functional capacity. For the reasons below, I disagree.

### III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing DIB and SSI claims, the Commissioner applies a five-step sequential evaluation process.  The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2011).  If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases.  *Id.*; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983).  The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy.  *Id.* at 869.

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).  Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1956-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Leedy argues that the ALJ's determination of her residual functional capacity is not supported by substantial evidence. Specifically, Leedy asserts that the ALJ improperly discounted the opinions of Dr. Lanthorn and Dr. Ehtesham, and erroneously afforded weight to the opinions of the state agency mental health experts.

In weighing medical opinions, the ALJ must consider factors such as the examining relationship, the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record. 20 C.F.R. §§ 404.1527(d), 416.927(d) (2011). Although treatment relationship is a significant factor, the ALJ is entitled to afford a treating source opinion "significantly less weight" where it is not supported by the record. *Craig*, 76 F.3d at 590.

In the present case, the ALJ considered the opinion of Dr. Lanthorn, but gave little weight to his assessment, for several reasons. First, Dr. Lanthorn's relationship with Leedy was limited — his opinion is based on a one-time examination, made at the request of Leedy's attorney. Second, Dr. Lanthorn's opinion is inconsistent with his own mental status evaluation as well as the other

medical evidence of record. For instance, Dr. Lanthorn indicated that Leedy had marked difficulties with anxiety and other areas of emotional conflict; however, he assigned Leedy a GAF score of 55-60, indicating only moderate symptoms or limitations. (R. at 425.) Furthermore, contrary to Dr. Lanthorn's opinion of debilitating mental limitations, the medical evidence demonstrates that Leedy was never hospitalized for mental problems, and that her anxiety required only conservative treatment and was controlled with medication. (R. at 454, 460, 470, 472, 474.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

With respect to Dr. Ehtesham, the ALJ's evaluation of her opinion is also supported by substantial evidence. Although Dr. Ehtesham was Leedy's treating psychiatrist, her assessment is not well-supported by the other medical evidence of record and is contrary to her own treatment notes. Dr. Ehtesham concluded that Leedy was "permanently disabled" and unable to work, even though her mental status findings were largely unremarkable, she reported on numerous occasions that Leedy's symptoms were improving or stable with Klonopin, and she consistently assessed Leedy a GAF score of 60, indicating only moderate symptoms and limitations. (R. at 430-39, 454-87.) Dr. Ehtesham's opinion was also inconsistent with her earlier finding in April 2009 that Leedy was able to maintain a job. (R. at 460.)

Finally, substantial evidence supports the ALJ's decision to afford weight to the opinions rendered by the state agency mental health experts. Leedy argues that the opinions of Dr. Jennings and Dr. Perrott are unreliable because they were given prior to Leedy's treatment by Dr. Ehtesham. However, this argument has no merit. Dr. Jennings and Dr. Perrott both opined that Leedy's anxiety disorder was not severe. While the ALJ afforded some weight to these opinions, she did not adopt them outright. (R. at 24.) Instead, the ALJ properly reviewed and considered Dr. Ehtesham's treatment records, as well as the other medical evidence of record, before determining that Leedy's anxiety disorder was a severe impairment that limited her to jobs with only occasional contact with the general public. The fact that Dr. Jennings and Dr. Perrott conducted their reviews before the record was closed does not render the ALJ's decision unsupported by substantial evidence.

## IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: February 8, 2012

/s/ James P. Jones
United States District Judge